**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| BRADLEY MEMORIAL ) | |
| HOSPITAL, *et al.,* ) | |
| Plaintiffs, ) | |
| ) | |
| ) | Civ. No. 04-416 (EGS) |
| v. ) | |
| ) | |
| MICHAEL O. LEAVITT, ) | |
| Secretary of the United ) | |
| States Department of Health ) | |
| and Human Services, ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM OPINION**

Twenty-seven plaintiff hospitals ("Plaintiffs") are providers of Medicare services in Connecticut.  Plaintiffs seek a writ of mandamus from this Court compelling the Secretary of Health and Human Services ("Secretary" or "Defendant"), either directly or through his intermediaries, to reopen Plaintiffs' cost reports submitted for reimbursement in the years 1994, 1995, and 1996.  Plaintiffs claim that Defendant owes them a clear, nondiscretionary duty to reclassify payments made by Plaintiffs under Connecticut's now-defunct "gross earnings tax" ("GET tax") as reimbursable costs and to recalculate and issue those

payments.  Pending before the Court are (1) Defendant's Renewed[1]
Motion to Dismiss Plaintiffs' First Amended Complaint; (2)
Plaintiffs' Renewed Motion for Summary Judgment; and (3)
Plaintiffs' Motion to Strike.  Upon consideration of the motions,
responses and replies thereto, and the applicable law, the Court
**GRANTS** Defendant's Motion to Dismiss and **DENIES** both of
Plaintiffs' Motions.


I.    **Background**

      A.    **Statutory and Regulatory Framework**

      The Medicare program, established by Title XVIII of the
Social Security Act, 42 U.S.C. § 1395 *et seq.*, pays for covered
medical services provided to eligible aged and disabled persons.
Part A of the Medicare program authorizes payments for, among
other things, certain inpatient hospital services.  *See id.* §§
1395c, 1395d.  A hospital participates in Medicare under a
"provider agreement" with the Secretary.  *See id.* § 1395cc.
Providers are reimbursed for the "reasonable" costs that they

---

[1]  Plaintiffs amended their complaint in January 2005, which prompted the
Court to dismiss without prejudice the parties' first round of potentially
dispositive motions.  Recognizing that in the time since the parties had
briefed a new round of motions there had been a number of notices of
supplemental authority filed that may have impacted the parties' arguments and
the Court's consideration and resolution of the issues in the case, the Court
denied those motions without prejudice subject to refiling.  Those renewed
motions are presently before the Court.

incur in treating Medicare beneficiaries.  *Id.* § 1395f(b).
Reasonable costs include "all necessary and proper costs incurred
in furnishing . . . services," which are further defined as
"costs that are appropriate and helpful in developing and
maintaining the operation of patient care facilities and
activities."  42 C.F.R. §§ 413.9(a), 413.9(b)(2).

The Centers for Medicare and Medicaid Services ("CMS")
(formerly known as the Health Care Financing Administration) is
the agency within the Department of Health and Human Services
that has been designated by the Secretary to administer the
Medicare program.  The Secretary, through CMS, has delegated many
of Medicare's audit and payment functions to fiscal
intermediaries, who are generally private insurers.  *See* 42
U.S.C. § 1395h.

Since 1983, the Secretary has reimbursed providers using a
Prospective Payment System ("PPS").  *Id.* § 1395ww(d).  Under PPS,
providers are generally paid a predetermined amount based on the
discharge diagnosis of patients as determined by their category
of illness treated or "Diagnostic Related Group," subject to
certain payment adjustments.  *See id.*

To receive reimbursement for services, eligible providers
must file "cost reports" with their intermediaries at the end of
each fiscal year.  42 C.F.R. §§ 413.20(b), 413.24(f).  Providers

3

are required to "furnish such information to the intermediary as may be necessary to . . . [a]ssure proper payment by the program." *Id.* § 413.20(d)(1)(I).  Intermediaries then audit the reports and determine the reimbursement amount owed to the providers.  That determination is memorialized in a Notice of Program Reimbursement ("NPR") and issued to the provider. *Id.* § 405.1803(a)(2).

A provider that is dissatisfied with an intermediary's payment determination has two ways to seek relief.  Pursuant to 42 U.S.C. § 1395oo, the provider may file an appeal with the Provider Review Reimbursement Board ("the Board").  The Board is "an administrative review panel that has the power to conduct an evidentiary hearing and affirm, modify, or reverse the intermediary's NPR determination." *Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 451 (1999).  Such an appeal must be filed within 180 days of the issuance of the NPR. 42 U.S.C. § 1395oo(a)(3).  The Board's decision, in turn, is subject to reversal, affirmance, or modification by the Secretary within sixty days. *Id.* § 1395oo(f)(1).  A provider that remains dissatisfied after this administrative review may then seek judicial review by filing suit in federal court. *Id.*

In addition to the statutory procedures described above, the Secretary's regulations provide a method for obtaining relief

4

directly from the intermediary by empowering intermediaries, under certain circumstances, to reopen cost reports.  *See* 42 C.F.R. § 405.1885.[2]  Two such circumstances are relevant in the present case.  First, an intermediary determination may be reopened at the request of a provider within three years of the date of the NPR.  *Id.* § 405.1885(a).  Reopening under § 405.1885(a) is permissive, and the denial of such a request is unreviewable by the courts.  *See Your Home*, 525 U.S. at 457 (explaining that the language of § 405.1885(a) "do[es] not require reopening, but merely permit[s] it," and concluding that because any duty to reopen under that section is discretionary, mandamus jurisdiction over a denial is necessarily improper).  Second, "an intermediary determination . . . shall be reopened and revised at any time if it is established that such determination . . . was procured by fraud or similar fault of any party to the determination."  42 C.F.R. § 405.1885(d).  It is under this latter provision that Plaintiffs, by way of a writ of mandamus from this Court, seek relief from Defendant.

### B.   Factual and Procedural Background

Between April 1, 1994 and April 1, 2000, Connecticut imposed the GET tax on hospitals operating within the state.  *See* Conn.

---

[2]  All citations to 42 C.F.R. § 405.1885 in this Memorandum Opinion refer to the version of the regulation in effect prior to August 1, 2002 that applies to the claims in this case.

Gen. Stat. § 12-263b; Am. Compl. ¶¶ 20-22.  Along with a sales
tax paid directly by patients to hospitals, the GET tax was part
of a program "designed to help defray the costs of providing
uncompensated hospital care to the indigent."  Def.'s Mem. Supp.
Renewed Mot. Dismiss ("Def.'s Mem.") at 12; *see* Conn. Gen. Stat.
§§ 19a-669, 19a-670 (establishing procedures for distributing
payments to hospitals according to their relative volume of
uncompensated care).  Hospitals were thus required to pay to the
state a certain percentage of their gross earnings in each
taxable quarter.[3]  Conn. Gen. Stat. § 12-263b.  If a hospital
failed to pay the GET tax within the statutory time limit, a
penalty would be incurred.  *Id.* § 12-263c.

From 1994 to 2000, Plaintiffs did not claim payments for the
GET tax on their annual cost reports submitted to the
intermediary[4] for reimbursement.  Plaintiffs do not dispute that
they never claimed the GET tax as a reimbursable expense on their

---

[3]  The amount of the GET tax decreased several times between April 1, 1994 and
when the tax was abolished in 2000.  *See* Conn. Gen. Stat. § 12-263b.  These
decreases, and the actual percentage amount of the tax, are not relevant here.

[4]  Plaintiffs contend that their intermediary was Blue Cross and Blue Shield
of Connecticut from 1994 until 1997, and that Anthem purchased Blue Cross in
1997 and acted as the intermediary until 1999, when Empire Medicare Services
took over.  *See* Am. Compl. ¶¶ 24, 27.  Defendants challenge this factual
assertion, claiming that "[a]t various times between 1994-2000, the cost
reports of six plaintiff hospitals were processed by two other
intermediaries."  Def.'s Mem. at 16 n.11.  Defendant acknowledges, however,
that for the purposes of a 12(b)(1) or 12(b)(6) analysis, Plaintiffs' well-
pled facts are taken as true.  The Court further notes that, except as noted
below, the identity of Plaintiffs' intermediary is irrelevant to the
disposition of the pending motions.

cost reports.  They do allege, however, that they were "strictly forbidden from claiming payments under the GET tax on their cost reports."  Am. Compl. ¶ 23.  Plaintiffs do not explain who forbade them from making such claims, nor do they allege that the Secretary or his agents explicitly forbade the hospitals from doing so.

The only explanation offered by Plaintiffs as to how they were "prevented" from claiming the GET tax on their cost reports is the alleged policy of the successive intermediaries to treat the GET tax as a nonreimbursable cost.  *See* Am. Compl. ¶¶ 24-27.  Plaintiffs allege that at least two individuals employed as auditors by the intermediaries understood the GET tax to be a nonreimbursable cost and that such individuals believed that the intermediaries had a policy of classifying the GET tax as nonallowable.  *Id.* ¶¶ 24-25.  One such individual claims that "documentation relative to these policies exist, including contemporaneous writings reflecting the fact that the intermediary's policy in the State of Connecticut was that the GET Tax was a non-allowable cost."  *Id.* ¶ 25(c).  Moreover, Plaintiffs allege that the Director of Budgets and Reimbursement for one plaintiff hospital was told, at some point "prior to 2002," by the intermediary's auditing staff that the GET tax was

not reimbursable and "should not be included" on the hospital's cost report.  *Id.* ¶ 26.

Plaintiffs' allegations of wrongdoing on the part of the intermediary are based in part on their contention that the Connecticut intermediary knew or should have known that the state of New York had a tax similar to the GET tax that CMS had deemed a reimbursable cost and that was being treated as such by the New York intermediary as early as June of 1995.  *See id.* ¶¶ 24(b), 25(b), 37(b)-(c).  Plaintiffs impute knowledge of the New York policy to the Connecticut intermediary because two of its employees attended regional meetings that included representatives of the New York intermediary.  *Id.* ¶¶ 24(b), 25(b).  According to the Amended Complaint, "the purpose of such meetings was to help develop and articulate consistent Medicare policies."  *Id.* ¶ 24(b).  Plaintiffs claim that once the Connecticut intermediary learned of the New York policy of reimbursement, it "should have begun to reimburse the Connecticut hospitals for GET payments."  *Id.* ¶ 37(b).

In 2001, Plaintiffs began working with Rex Shera, an Ernst & Young LLP accountant, in an attempt "to get the Secretary and [the intermediary] to recognize the GET Tax as an allowable, reimbursable cost."  *Id.* ¶ 28.  According to Plaintiffs, Shera sent a letter to the Acting Director of the Division of Cost

Reporting at CMS, arguing that the GET tax was an allowable cost and requesting "that CMS issue a statement to that effect." *Id.* ¶ 28(a). Less than five months later, the Acting Director responded in agreement and ordered that the intermediary reimburse the hospitals. *Id.* ¶ 28(b).

In response to the letter from CMS, Plaintiffs contend that they sent reopening requests to the intermediary requesting that it "reopen all of the cost report years from the inception of the tax up through the date of the reopening request" and that it reimburse the hospitals. *Id.* ¶ 30. The intermediary "proceeded to reopen the closed cost reports for the vast majority of the hospitals working with Ernst & Young LLP for fiscal years that had been the subject of an NPR issued in the preceding three years . . . and paid the hospitals the additional reimbursement." *Id.* ¶ 28(d). In addition, the intermediary contacted hospitals that were not working with Ernst & Young LLP and "provided the opportunity to reopen their cost reports retrospectively . . . , irrespective of whether or not they had claimed GET Tax payments on their cost reports as originally filed." *Id.* ¶ 28(f).

Plaintiffs did not pursue an administrative appeal of the intermediary's refusal to reopen the cost reports for the years 1994, 1995, and 1996. Instead, Plaintiffs filed this lawsuit, claiming that the failure to treat the GET tax as a reimbursable

cost during that time period constitutes a violation of the
Medicare Act.  Plaintiffs seek mandamus relief under 28 U.S.C. §
1361, arguing that the Secretary owes them a clear,
nondiscretionary duty to reopen Plaintiffs' cost reports from
1994 through 1996 and to issue payment reflecting the proper
reimbursement, the amount of which they claim exceeds $17
million.  *See* Am. Compl. ¶¶ 31, 34-37.  Defendant argues that
Plaintiffs have failed to state a claim under § 1361, and that
dismissal is therefore proper under both Federal Rules of Civil
Procedure 12(b)(1) and 12(b)(6).  *See* Def.'s Mot. Dismiss Pls.'
First Am. Compl.


## II.  **Plaintiffs' Motion to Strike**

As a preliminary matter, Plaintiffs move the Court to strike
from Defendant's Renewed Motion to Dismiss all references to and
arguments based on any documents outside of the Amended
Complaint.  Pls.' Mem. Supp. Mot. Strike at 2-3.  Plaintiffs'
argument, however, is based on the false premise that Defendant
seeks dismissal only under Federal Rule of Civil Procedure
12(b)(6).  That argument, in turn, appears to be completely
reliant on the Defendant's inclusion of the phrase – in a
footnote that appears in Defendant's Memorandum in Support of His
Renewed Motion to Dismiss – "for purposes of this motion, the

averments in the complaint are taken as true." *Id.* (quoting
Def.'s Mem. at 16 n.11).  But Defendant's original Motion to
Dismiss Plaintiffs' First Amended Complaint explicitly requested
dismissal under *both* Rules 12(b)(1) and 12(b)(6).[5]  The Court may
look beyond the pleadings in resolving a motion to dismiss for
lack of subject-matter jurisdiction based on Rule 12(b)(1), *see,
e.g.*, *Alliance for Democracy v. Fed. Election Comm'n*, 362 F.
Supp. 2d 138, 142 (D.D.C. 2005), and Plaintiffs' contention that
Defendant inappropriately cited to materials outside the
pleadings therefore lacks merit.

Plaintiffs' argument in support of their Motion to Strike
also fails to recognize that, particularly in the context of a
request for mandamus relief, the question of the Court's subject-
matter jurisdiction sometimes converges with a consideration of
the merits.  *See In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005)
(en banc) ("[I]f there is no clear and compelling duty under the
statute as interpreted, the district court must dismiss the
action.  To this extent, mandamus jurisdiction under § 1361

---

[5]  The Court flatly rejects the implication of Plaintiffs' argument – that an
earlier dismissal of motions without prejudice "wip[es] the slate clean" such
that the Court is prohibited from referencing or acknowledging the existence
of previously filed pleadings.  *See* Pls.' Mem. Supp. Mot. Strike at 2.
Plaintiffs cite no authority for such a proposition, and the Court finds
patently unreasonable the suggestion that Defendant's original Motion to
Dismiss Plaintiffs' First Amended Complaint, the one "renewed" by the Motion
currently before the Court, must be entirely ignored.  Nevertheless, the Court
also notes that this entire discussion could have been avoided had Defendant
simply included an explicit reference to Rules 12(b)(1) and 12(b)(6) in its
Renewed Motion.

merges with the merits."). For example, if this Court finds that Plaintiffs have failed to state a claim under 28 U.S.C. § 1361, the case must be dismissed pursuant to Rule 12(b)(6). And because § 1361 provides the only potential basis for this Court's jurisdiction in the present case, such a finding would likewise mandate dismissal under Rule 12(b)(1). For these reasons, Plaintiffs' Motion to Strike is **DENIED**.

## III. Standard of Review

### A.   Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 8(a), a pleading stating a claim for relief must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief'" in order to provide to the defendant "fair notice of the claims against" him. *Ciralsky v. CIA*, 355 F.3d 661, 669, 670 (D.C. Cir. 2004) (quoting Fed. R. Civ. P. 8(a)); *see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam). "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 n.8 (2007). In considering a 12(b)(6) motion, the Court

should construe the complaint "liberally in the plaintiff's favor," "accept[ing] as true all of the factual allegations" alleged in the complaint. *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) (alteration in original) (quoting *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008)). Plaintiffs are entitled to "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

**B.   Rule 12(b)(1)**

On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The Court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion because subject-matter jurisdiction focuses on the Court's power to hear the claim. *Uberoi v. EEOC*, 180 F. Supp. 2d 42, 44 (D.D.C. 2001).  In resolving a motion to dismiss for lack of subject-matter jurisdiction, the Court may consider materials outside the pleadings to determine whether it has jurisdiction. *Alliance for Democracy*, 362 F. Supp. 2d at 142.

## IV.   **Plaintiffs Are Not Entitled to Mandamus Relief**

Plaintiffs seek relief under the mandamus statute, which gives district courts original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "The remedy of mandamus 'is a drastic one, to be invoked only in extraordinary circumstances.'" *In re Medicare Reimbursement Litig.*, 309 F. Supp. 2d 89, 96 (D.D.C. 2004) (quoting *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)). Thus, a plaintiff may seek relief by way of mandamus "only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty."[6] *Heckler v. Ringer,* 466 U.S. 602, 616 (1984); *see Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001) ("[T]o maintain an action under § 1361, a plaintiff must both exhaust administrative remedies and show a clear non-discretionary duty." (citing *Ringer*, 466 U.S. at 616-17)). "The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *In*

---

[6] This standard has also been articulated as a three-part test, so that a court may conclude mandamus relief is available if: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *In re Medicare Reimbursement*, 309 F. Supp. 2d at 96 (quoting *N. States Power Co. v. U.S. Dep't of Energy,* 128 F.3d 754, 758 (D.C. Cir. 1997)).

*re Medicare Reimbursement*, 309 F. Supp. 2d at 96 (internal quotation marks omitted).

Defendant argues that Plaintiffs' Amended Complaint should be dismissed because, by Plaintiffs' own admission, they failed to (1) claim the GET tax as a reimbursable expense on their cost reports in the first instance, and the intermediaries therefore never even had an opportunity to deny any requests for reimbursement; (2) appeal an adverse intermediary decision to the Board; or (3) seek judicial review of an adverse decision by the Board.  Def.'s Mem. at 21.  According to Defendant, "[t]he failure to take advantage of these available statutory avenues of relief is sufficient, standing alone, to preclude mandamus relief."  *Id.*; *see, e.g.*, *Ass'n of Am. Med. Colls. v. Califano*, 569 F.2d 101, 111 (D.C. Cir. 1977) (concluding that because 42 U.S.C. § 1395oo "plainly authorized review" of the challenged action, the mandamus statute could not provide a basis for federal-court jurisdiction); *Lenox Hill Hosp. v. Shalala*, 131 F. Supp. 2d 136, 140 (D.D.C. 2000) (recognizing that because the plaintiff had "an available administrative remedy under the Medicare program," the court could not exercise jurisdiction under the mandamus statute).  Defendant further contends that this Court need look no further than *Heckler v. Ringer*, 466 U.S. 602, to conclude that Plaintiffs' failure to employ the

15

administrative-appeal system precludes the availability of
mandamus relief.

In *Ringer*, the Secretary "issued a formal administrative
ruling, intended to have binding effect" on administrative
decisionmakers, prohibiting them from reimbursing individual
claimants for an experimental medical operation that took place
after a certain date. *Id.* at 608. Three of the *Ringer*
plaintiffs, who had had the surgery before that date, filed a
claim for reimbursement with their fiscal intermediary and were
in the middle of the administrative-appeals process when the
Secretary issued its ruling. *Id.* at 609. These plaintiffs, "who
ha[d] requested reimbursement at some, but not all, levels of the
administrative process," filed suit in federal court as soon as
the ruling was issued. *Id.* at 613. The district court dismissed
their claims, concluding that it lacked jurisdiction based on the
plaintiffs' failure to exhaust administrative remedies. *Id.* at
611. The Supreme Court agreed, concluding that mandamus
jurisdiction was inappropriate because the plaintiffs "clearly
ha[d] an adequate remedy" in the statutory provisions providing
for administrative review of reimbursement claims. *Id.* at 617.

In response to the plaintiffs' argument that completing the
administrative process would have been futile, the Court stated
that exhaustion was "in no sense futile" simply because the

plaintiffs thought it unlikely that they would succeed in the face of the Secretary's ruling.[7]  *Id.* at 619.  To the contrary, given that the plaintiffs had received the surgery *prior* to the ruling, it was not even applicable to the plaintiffs' claims. *See id.*

As noted above, Plaintiffs concede that they did not seek administrative relief through the procedures laid out in 42 U.S.C. § 1395oo.  They argue, however, that the administrative-exhaustion requirement discussed in *Ringer* is inapplicable in the present case.  First, Plaintiffs claim that unlike the *Ringer* plaintiffs, who sought "substantive relief," Plaintiffs' claims "are <u>procedural</u> in nature."  Pls.' Mem. Opp'n to Def.'s Renewed Mot. Dismiss at 4 (emphasis in original).  According to Plaintiffs, this distinction means that the exhaustion analysis contained in *Ringer* "has no place in a discussion of whether the Plaintiffs in the present matter are entitled to mandamus relief."  *Id.* at 4-5.

This Court rejects Plaintiffs' argument that *Ringer* does not apply here.  The *Ringer* Court explicitly addressed and rejected the procedural/substantive distinction advanced by Plaintiffs.

---

[7]  The *Ringer* Court similarly concluded that the mandamus statute did not confer jurisdiction over the complaint of another plaintiff, whose "claim for reimbursement, unlike that of the others, would be covered by the formal ruling."  *Id.* at 620.  This fourth plaintiff, upon discovering from the Secretary that the procedure would not be covered under the Medicare Act, decided not to have the surgery because he could not afford it.  *See id.* at 610.

In that case, the court of appeals had relied on precisely that distinction in reversing the district court's dismissal, concluding that exhaustion should not apply to the plaintiffs' claims to the extent they constituted a challenge to "the Secretary's procedure for determining entitlement to benefits" rather than a substantive claim for those benefits.  *Ringer*, 466 U.S. at 612.  The Supreme Court disagreed with that characterization:

> It seems to us that it makes no sense to construe the claims of [the plaintiffs] as anything more than, at bottom, a claim that they should be paid for their [procedure]. . . .  [T]he relief that respondents seek to redress their supposed "procedural" objections is the invalidation of the Secretary's current policy and a "substantive" declaration from her that the expenses of [the procedure] are reimbursable under the Medicare Act.  We conclude that all aspects of [the plaintiffs'] claim for benefits should be channeled first into the administrative process which Congress has provided for the determination of claims for benefits.  We, therefore, disagree with the Court of Appeals' separation of the particular claims here into "substantive" and "procedural" elements.

*Id.* at 614.

Plaintiffs' argument is analytically indistinguishable from the court of appeal's reasoning rejected by the *Ringer* Court. Plaintiffs may seek procedural relief by way of a writ of mandamus ordering the Secretary to reopen Plaintiffs' cost reports, but the ultimate relief they seek is undoubtedly substantive.  Indeed, at no point do Plaintiffs contend that they

merely seek to vindicate their alleged procedural right to reopening under 42 C.F.R. § 405.1885(d).  Their ultimate goal, of course, is to recover the $17 million to which they claim an entitlement.

Furthermore, this Court fully believes that the principles articulated in *Ringer* apply with equal force in the present case. Plaintiffs' contention – without *any* citation to authority whatsoever – that no administrative remedies exist to vindicate their claim under § 405.1885(d) is flatly contradicted by 42 U.S.C. § 1395oo, which provides a clear method for challenging an intermediary's NPR.  Just as in *Ringer*, Plaintiffs have failed to show that they would not or could not have received their requested relief by way of the administrative-appeals process established by that statute.  Those administrative procedures exist precisely so that the agency with expertise in matters such as reimbursement may be given an opportunity to correct errors made by the intermediary.  *See Michael Reese Hosp. & Med. Ctr. v. Thompson*, 427 F.3d 436, 441 (7th Cir. 2005) ("The exhaustion requirement serves an important purpose, preventing the premature interference with agency processes so that the agency can function efficiently and can correct its own errors, as well as affording the parties and the courts the benefit of the agency's experience and expertise and compiling a record which is adequate

19

for judicial review." (citing *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975))); *see also Ringer*, 466 U.S. at 619 n.12 (quoting *Salfi*, 422 U.S. at 765).  In the absence of a compelling reason to excuse Plaintiffs' decision not to take advantage of those procedures, such a failure defeats their claim for mandamus relief.

That Plaintiffs failed to even attempt to claim the GET tax on their cost reports in the first instance or to directly challenge the intermediary's alleged policy of non-reimbursement only renders more unreasonable Plaintiffs' failure to utilize "the administrative process which Congress has provided for the determination of claims for benefits." *See Ringer*, 466 U.S. at 614.  Defendant correctly notes that the burden is on Plaintiffs not to simply rely on the intermediary's informal policy position in making decisions about what costs are reimbursable.  Indeed, "[a]s a participant in the Medicare program, [Plaintiffs] had a duty to familiarize [themselves] with the legal requirements for cost reimbursement." *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 64 (1984).  Likewise, Plaintiffs also should have been "acquainted with the nature of and limitations on the role of a fiscal intermediary." *Id*.  The consequences of Plaintiffs' decision not to pursue reimbursement of the GET tax through the intermediary and to rely on statements made by the

20

intermediary's employees cannot now be blamed on the Secretary.

As the Supreme Court explained:

> There is simply no requirement that the Government
> anticipate every problem that may arise in the
> administration of a complex program such as Medicare;
> neither can it be expected to ensure that every bit of
> informal advice given by its agents in the course of
> such a program will be sufficiently reliable to justify
> [reliance by a provider].  Nor was the advice given
> under circumstances that should have induced
> respondent's reliance.  As a recipient of public funds
> well acquainted with the role of a fiscal intermediary,
> respondent knew [the intermediary] only acted as a
> conduit; it could not resolve policy questions.  The
> relevant statute, regulations, and Reimbursement
> Manual, with which respondent should have been and was
> acquainted, made that perfectly clear.  Yet respondent
> made no attempt to have the question resolved by the
> Secretary; it was satisfied with the policy judgment of
> a mere conduit.

*Id.* at 64-65 (footnotes omitted).

In the alternative, Plaintiffs rely on *Monmouth Medical Center v. Thompson*, 257 F.3d 807 (D.C. Cir. 2001) and *In re Medicare Reimbursement Litigation*, 309 F. Supp. 2d 89 (D.D.C. 2004), *aff'd* 414 F.3d 7 (D.C. Cir. 2005), to argue that their failure to pursue an administrative remedy should be excused because that avenue of relief was "foreclosed or futile."  *See* 257 F.3d at 815.  At issue in both of those cases were claims made by hospitals for additional reimbursement based on services rendered to indigent clients.  Under the PPS, providers receive certain hospital-specific adjustments to their reimbursements, one of which is a "disproportionate share" ("DSH") adjustment for

hospitals that serve a disproportionate number of low-income patients.  *See* 309 F. Supp. 2d at 92-93 (citing 42 U.S.C. § 1395ww(d)).  Before the plaintiffs brought suit, providers in numerous jurisdictions had brought legal challenges to the Secretary's method of calculating the DSH adjustment and had uniformly won in the courts of appeals.  *See id.* at 93.  In response, the Secretary "issued a ruling that rescinded the original interpretation of the [relevant] statutory provision and prospectively mandated" an interpretation more favorable to hospitals.  *Id.; see also Monmouth*, 257 F.3d at 810.  The Secretary "explicitly foreclosed retrospective application," permitting recalculations only for "as yet unsettled cost reports and all cases in which 'jurisdictionally proper' appeals were still pending."  257 F.3d at 810 (quoting Health Care Financing Administration Ruling 97-2 (Feb. 27, 1997)).

Upon the announcement of Ruling 97-2, the *Monmouth* plaintiffs filed reopening requests with their intermediaries under 42 C.F.R. § 405.1885 and appeals with the Board upon the intermediary's denial of the hospitals' requests.  After the Board dismissed their appeals, the hospitals sought relief in the district court, which dismissed the case based on lack of subject-matter jurisdiction. *See id.* at 808, 810.

The D.C. Circuit reversed, concluding that jurisdiction was proper under 28 U.S.C. § 1361.  In support of their argument under that statute, the plaintiffs claimed that the intermediaries had a nondiscretionary duty to reopen the cost reports under 42 C.F.R. § 405.1885(b), which stated that an intermediary determination or decision "shall be reopened" if within three years of the determination the Secretary "notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions" previously issued by the Secretary.  The *Monmouth* court reasoned that the relevant question for the court to consider was whether Ruling 97-2 "in effect announced a finding of inconsistency" such that the intermediary had a clear, nondiscretionary duty to reopen under the regulation.  257 F.3d at 813.

The court answered that question affirmatively and, because the plaintiffs had "done all they can to vindicate their right to reopening," dismissed as irrelevant the fact that the hospitals had failed to exhaust their remedies by appealing their NPRs within 180 days as required by 42 U.S.C. § 1395oo(a)(3).  This conclusion, in turn, rested on the court's earlier discussion of why both the court's and the Board's jurisdiction were improper under § 1395oo in the first instance; namely, because plaintiffs

23

had framed their challenge to Ruling 97-2 itself, not to the intermediaries' final reimbursement decision. *See id.* at 811. Moreover, it would have been futile for the hospitals to have appealed the intermediary's decision to the Board within the 180-day time limit contained in § 1395oo, because Ruling 97-2 was not in effect until after the time for such an appeal had passed. Framed in this way, the *Monmouth* court found it clear that "all other avenues of relief are either foreclosed or futile." *Id.* at 815.

In contrast to the *Monmouth* plaintiffs, the plaintiff hospitals in *In re Medicare Reimbursement* did not file reopening requests pursuant to 42 C.F.R. § 405.1885. *See* 309 F. Supp. 2d at 95. The *In re Medicare Reimbursement* court nevertheless concluded that, under the regulations, the intermediaries had a clear duty to reopen the cost reports based on Ruling 97-2, even in the absence of a request by the provider. *Id.* at 97-98. With respect to the exhaustion issue, the court concluded that plaintiffs' failure to file requests for reopening with the intermediary did not preclude a finding that alternative avenues of relief would be futile:

> Ruling 97-2 itself expressly stated that the Secretary *would not* reopen past NPRs on the basis of her changed statutory interpretation. Under defendant's logic, plaintiffs had a duty post-Ruling to exhaust their claims through an administrative process that the Secretary . . . herself announced was unavailable.

24

> This argument is unconvincing.  Second, the court in
> *Monmouth* concluded that a request for review at the
> time of the NPRs through the regular agency appeal
> process was futile.

*Id.* at 98 (footnotes and internal citation omitted).

Plaintiffs argue that, like the plaintiffs in *Monmouth* and *In re Medicare Reimbursement*, it would have been "unrealistic" to pursue administrative remedies when Plaintiffs knew the intermediary's position was that the GET tax was not an allowable cost.  *See* Pls.' Mem. Supp. Summ. J. at 29.  According to Plaintiffs, they had no way of knowing that they had a viable administrative claim until CMS instructed the intermediary to treat the GET tax as reimbursable.  *Id.* at 30.

This Court is unpersuaded by Plaintiffs' broad reading of *Monmouth* and *In re Medicare Reimbursement*.  In those cases, the *Secretary* had a specific rule in place that was later determined to be contrary to law.  Here, the Secretary never promulgated a rule relating to the GET tax, nor did the Secretary or CMS issue any statement regarding the agency's position.  As discussed above, as Medicare participants Plaintiffs should have known that the intermediary lacks the authority to promulgate agency-wide policies or rules.  *See Cmty. Health Servs.*, 467 U.S. at 64.

Indeed, quite apart from the intermediary's position on the GET tax, Plaintiffs have made no allegations from which this Court could reasonably infer that an appeal to the Board would

have been futile.  Unlike in *Monmouth* and *In re Medicare
Reimbursement*, where the Board was bound by Ruling 97-2, the
Board in the present case would have been free to disagree with
the intermediary's position and to order the intermediary to
treat the GET tax as a reimbursable cost.  If Plaintiffs believed
between 1994 and 2000 that the GET tax qualified as an allowable
cost under the Medicare Act, they could have and should have
timely claimed the disputed tax as a reimbursable expense on
their cost reports and challenged any denial by the intermediary
by filing an administrative appeal pursuant to 42 U.S.C. §
1395oo.  Plaintiffs' contention that it would have been futile to
do so because the intermediary had a policy of not reimbursing
the GET tax misses the point.  The point of pursuing
administrative relief is to exhaust avenues by which Plaintiffs
might have convinced the agency to change its position without
resorting to the type of extraordinary relief that Plaintiffs now
request.

In short, this Court concludes that Plaintiffs had other
avenues of relief available and that, for this reason, the Court
lacks jurisdiction under 28 U.S.C. § 1361 to grant Plaintiffs'
requested relief.  *See Lenox Hill Hosp.*, 131 F. Supp. 2d at 140;
*see also Bailey v. Mutual of Omaha Ins. Co.*, 534 F. Supp. 2d 43,
52 (D.D.C. 2008) (summarily concluding that asserting subject-

matter jurisdiction under the mandamus statute was inappropriate because the plaintiff had "another route to relief – instituting the individual claims review process and carrying that procedure to its exhaustion before seeking judicial relief").  This conclusion is actually buttressed by the facts as described by Plaintiffs themselves, which demonstrate that as soon as CMS was given an opportunity to weigh in on the status of the GET tax, Plaintiffs' position on the tax was vindicated.  *See* Am. Compl. ¶ 28.  Viewed in this way, Plaintiffs' contention that seeking relief at an earlier point would have been futile would require the Court to stretch reasonable inferences beyond all limits.

Having concluded that Plaintiffs have not met their burden of showing an absence of all other avenues of relief sufficient to confer mandamus jurisdiction, the Court need not engage in an extended discussion of whether Defendant owes Plaintiffs a clear, nondiscretionary duty to reopen the cost reports from the years in question.  The Court notes, however, that it is unlikely Plaintiffs have shown that Defendant has such a duty under the Medicare Act or its implementing regulations.  In particular, the Court doubts whether the facts alleged in the Amended Complaint, even when taken as true, are sufficient to demonstrate that the Secretary or his agents engaged in any activity that could reasonably be construed as similar enough to fraud such that such

actions constitute "similar fault" under the regulation. Moreover, even if Plaintiffs' claim that the intermediary misled the hospitals about the New York hospital tax and misrepresented the GET tax as nonreimbursable could survive the liberal Rule 12(b)(6) standard in another context, Plaintiff has not sustained their burden of showing a "clear and indisputable" right to relief as is required to meet their burden of showing an entitlement to relief under the mandamus statute.  *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988) (internal quotation marks omitted); *see In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (noting that "a plaintiff's legal grounds supporting the government's duty to him must 'be clear and compelling,' and explaining "if there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action" (quoting *13th Regional Corp. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980))).  In any event, the evidence proffered by Plaintiffs in support of their Renewed Motion for Summary Judgment is certainly not sufficient to demonstrate an absence of a genuine issue of material fact such that Plaintiffs are entitled to summary judgment at this stage and, were it not moot in light of the Court's decision to grant Defendant's Motion to Dismiss, Plaintiffs' Motion would be denied for that reason.

**V.    Conclusion**

For the reasons stated, Defendant's Motion to Dismiss is

**GRANTED** on the basis of Federal Rules of Civil Procedure 12(b)(1)

and 12(b)(6).  Plaintiffs' Motion to Strike is **DENIED** and

Plaintiffs' Renewed Motion for Summary Judgment is **DENIED** as

moot.  An appropriate order of dismissal accompanies this

memorandum opinion.

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**March 2, 2009**